IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 10-663-6 |
| | : | |
| MARK MILLER | : | |

## MEMORANDUM

**Padova, J.**                                                                                                    **June 21, 2012**

On March 14, 2012, Defendant Mark Miller was convicted by a jury of one count of conspiracy to distribute five kilograms or more of cocaine and 50 grams or more of cocaine base ("crack"), in violation of 21 U.S.C. § 846 (Count Five), and seven counts of laundering of monetary instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) (Counts Twenty-One through Twenty-Seven). Miller has moved for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 as to the money laundering counts. The Motion is denied for the following reasons.

**I.    LEGAL STANDARD**

Federal Rule of Criminal Procedure 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). In deciding a Rule 29 motion, we "'review the record in the light more favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" United States v. Bobb, 471 F.3d 491, 494 (3d Cir. 2006) (quoting United States v. Smith, 294 F.3d 473, 476 (3d Cir. 2002)). "'[W]e must sustain the verdict if a rational trier of fact could have found [the] defendant guilty beyond a reasonable doubt, and the verdict is supported by substantial evidence.'" United

States v. Davis, 458 F. App'x 152, 156 (3d Cir. 2012) (alterations in original) (quoting United States v. McKee, 506 F.3d 225, 232 (3d Cir. 2007)). In making our determination, we "draw all reasonable inferences in favor of the jury's verdict and will find that the evidence was insufficient only where the prosecution's failure of proof is clear." Id. (citing Smith, 294 F.3d at 476–77). Moreover, "we 'must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury.'" Id. (alterations in original) (quoting United States v. Brodie, 403 F.3d 123, 133 (3d Cir. 2005)).

## II. DISCUSSION

Second Superseding Indictment No. 663 charged Miller with money laundering in connection with the transfer of the property he owned at 2410 Vista Street, Philadelphia, Pennsylvania, in March 2007 (Counts 21 and 22) and in connection with a mortgage he obtained on the property he owned at 4829 Mulberry Street, Philadelphia, Pennsylvania, in March 2006 (Counts 23-27). The money laundering statute, 18 U.S.C. § 1956, provides that a person is guilty of money laundering if he

> (1) knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, (2) conducts or attempts to conduct such a financial transaction involving the proceeds of unlawful activity, (3) with either (a) the intent to promote the carrying on of specified unlawful activity; or (b) knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the *proceeds* of specified unlawful activity . . . .

United States v. Bansal, 663 F.3d 634, 645 (3d Cir. 2011) (citing 18 U.S.C. § 1956(a)(1)). Congress's use of the term "represents" means that the property used does not have to be directly derived from the specified unlawful activity. Rather, "the crime of money laundering by its very nature involves the change of criminal [proceeds] into other forms of currency or property." United

States v. Carr, 25 F.3d 1194, 1205 (3d Cir. 1994). Consequently, if United States currency that is directly derived from drug trafficking is exchanged for fresh United States currency, the fresh currency "represent[s] the illegal drug money." Id. "The proceeds of unlawful activity may remain illegal proceeds even if they change form through a chain of transactions." United States v. Gotti, 457 F.Supp.2d 411, 422 (S.D.N.Y. 2006). Therefore, if money derived from drug trafficking is used to purchase real property, and that real property is used as collateral for a loan, the loan represents the proceeds of drug trafficking activity and using the loan to purchase additional property is a money laundering offense. See, e.g. United States v. Real Property Identified as Parcel 03179-005R, 311 F. Supp. 2d 126, 130 (D.D.C. 2004) ("[Dr. Howard's] St. Joe, Florida property had been obtained purely with illegally obtained funds. Thus, when Dr. Howard used the Florida property to obtain the funds secured by the second mortgage, he knew he was using property that had been purchased with proceeds of specified unlawful activity to acquire the funds. And, when he then used the funds he received from the second mortgage to obtain the release of the lien on the aircraft, he engaged in money laundering activity that involved the aircraft. This amounted to a violation of 18 U.S.C. § 1956.").

Miller asks that we enter a judgment of acquittal on his behalf on the money laundering counts because the Government failed to prove (1) that the financial transactions charged in those counts involved the proceeds of specified unlawful activity and (2) that he engaged in the financial transactions to conceal the nature and source of those proceeds.

A.  Proceeds

Miller does not challenge the sufficiency of the Government's evidence that he purchased the 2410 Vista Street property in 1997 and the 4829 Mulberry Street property in 2004, using funds

derived from drug trafficking activity. Indeed, he concedes that "[t]he Government's proof strongly suggests that the Defendant used drug proceeds to acquire" both properties. (Def.'s Mem. at 5.) Miller also does not dispute "that drug trafficking is a 'specified unlawful activity.' It clearly is." United States v. Richardson, 658 F.3d 333, 338 (3d Cir. 2011) (citing 18 U.S.C. § 1956(c)(7)(A)). He argues, instead, that a recent decision of the Supreme Court defined the term "proceeds" in the money laundering statute to mean "profits," and that the Government's evidence at trial was insufficient to sustain his conviction because the Government did not prove that the property involved in the charged financial transactions represented the profits from drug trafficking.

Miller relies on United States v. Santos, 553 U.S. 507 (2008), to support this argument. In Santos, a four-justice plurality determined that the term "proceeds" in the money laundering statute means profits, as opposed to gross receipts. Richardson, 658 F.3d at 338 (citing Santos, 553 U.S. at 514-15). Santos involved the use of the gross receipts of an illegal lottery, and the plurality's determination is not applied when the predicate offense involves drug trafficking. Instead, we look to Justice Stevens' concurring opinion and Justice Alito's dissent. Justice Stevens concurred in the judgment, but disagreed with the plurality's determination "that 'proceeds' should always be construed to mean profits." Id. at 339 (citing Santos, 553 U.S. at 525 (Stevens, J., concurring in judgment)). Justice Stevens analyzed the legislative history of the money laundering statute and concluded that Congress intended "proceeds" to mean gross receipts in some circumstances. He explained that "'the legislative history of [the money-laundering statute] makes it clear that Congress intended the term proceeds to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales.'" Id. (alteration in original) (quoting Santos, 553 U.S. at 525–26 & n.3). Justice Alito, writing for the four dissenting justices, agreed with Justice

4

Stevens that "a receipts definition [is] appropriate in cases arising from 'the sale of contraband and the operation of organized crime syndicates involving such sales.'" Id. (quoting Santos, 553 U.S. at 531–32 (Alito, J., dissenting)). The United States Court of Appeals for the Third Circuit has consequently determined, in accordance with the "persuasive authority" of "the collective view of five justices" in Santos, that the term "proceeds" as it is used in the money laundering statute, "means gross receipts" when the specified unlawful activity is drug trafficking. Id. at 340; see also Lugo v. Zickefoose, 427 F. App'x 89, 92 (3d Cir. 2011) (stating that, for the purposes of the money laundering statute, the "term 'proceeds' includes gross revenues for drug sales.").

The Government therefore was not required to prove that Miller used the profits of drug trafficking to purchase the subject properties. Miller's argument that the evidence the Government presented at trial was insufficient to support his convictions for money laundering (Counts 21-27) because the Government did not present evidence that the funds used he to purchase the 2410 Vista Street and 4829 Mulberry Street properties were the profits, rather than the gross receipts, of drug trafficking, thus fails as a matter of law. Miller's Rule 29 Motion is, therefore, denied as to this argument.

B. Intentional Concealment

Miller also argues that the Government did not satisfy its burden of proof with respect to his money laundering convictions because the Government did not prove that the financial transactions charged in Counts 21-27 of Second Superseding Indictment No. 10-663 were designed to conceal the nature and source of the proceeds of the specified unlawful activity in accordance with Cuellar v. United States, 553 U.S. 550 (2008). In Cuellar, the Supreme Court made it clear that for purposes of the money laundering statute, "'design means purpose or plan, *i.e.*, the intended aim of the'

5

transactions." Richardson, 658 F.3d at 340 (quoting Cuellar, 553 U.S. at 563). Miller argues that the Government did not present sufficient evidence at trial to prove that he purposefully concealed the nature and source of the proceeds used to purchase the properties that were the subject of Counts 21-27. We have, therefore, reviewed the evidence presented by the Government at trial regarding the charged transactions.

Counts 21 and 22 relate to Miller's March 16, 2007 sale of the 2410 Vista Street property, which he purchased on August 11, 1997 and mortgaged and remortgaged in the years before he sold it. Count 21 concerns Miller's cashing a check for $22,412.34 on March 16, 2007; Count 22 concerns Miller's purchase of a $22,412.34 check on March 16, 2007. Counts 23-27 relate to the 4829 Mulberry Street property, which Miller purchased on September 24, 2004, and mortgaged on February 28, 2006. Count 23 concerns a wire transfer of $73,007.83 from the mortgage company to the title company that handled the closing for the mortgage and Counts 24, 25, 26 and 27 concern checks totaling about $51,000 that were written to Miller from the proceeds of the mortgage. The Government presented evidence at trial that Miller had little reported income from legal sources during the 1997-2007 time period and that many of the documents he submitted in connection with the purchase of the 2410 Vista Street property and the mortgages that he obtained on both properties contained false information.

Janette Budney, an operations supervisor in the downtown Philadelphia field office for the Social Security Administration, testified that according to Social Security records, Miller's total reported income was only $12,506.39 between 1986 and 2007. (3/1/12 N.T. at 213,221; Gov't Ex. 155B.) Kenneth J. Kelly, an IRS Revenue Agent, testified that Miller did not file any tax returns from 1990 to 2001. (3/5/12 N.T. at 247, 265-266; Gov't Ex. 159K.) Miller did file tax returns in

2002, 2003 and 2004, reporting income of $9,000 in 2002, $9,460 in 2003 and $11,220 in 2004. (Id. at 251-52, 266, Gov't Exs. 145B-D, 159K.) Miller did not file tax returns for 2005-2007. (Id. at 266; Gov't Ex. 159K.)

Former IRS Special Agent Gerald Loke, who is currently employed as a financial investigator for the Organized Crime Drug Enforcement Task Force of the DEA, testified about the investigation he did with respect to the money laundering offenses charged in Second Superseding Indictment No. 10-663. (3/8/12 N.T. at 104 - 3/9/12 N.T. at 60.) Agent Loke reviewed certified records relating to properties purchased by Miller between December 16, 1991 and June 25, 2007, including the 2410 Vista Street and 4829 Mulberry Street properties. (3/8/12 N.T. at 108-12.) He also reviewed bank accounts belonging to Miller with Wells Fargo and Third Federal Bank. (Id. at 113.)

1. The 2410 Vista Street Property

Miller purchased the 2410 Vista Street property in 1997 for $102,391.73. (3/9/12 N.T. at 18; Gov't Ex. 123.1.) Agent Loke testified that Miller paid for most of the purchase price through a mortgage in the amount of $46,300 and through $34,000 in checks and money orders (which checks and money orders could be traced to cash). (3/9/12 N.T. at 20, 23; Gov't Ex. 134A.1.) Agent Loke was unable to trace the remainder of the funds used for the purchase of 2410 Vista Street. (Id. at 23-24.)

The mortgage application, which Miller signed, states that Miller had been employed by Leaks Construction for more than five years at the time he signed the application and that he made $3,429 per month. (Id. at 20-21, Gov't Ex. 134A.1.) Miller did not file a tax return in 1997 and Agent Loke did not find any record of a form W-2 or 1099 that had ever been filed with the IRS showing that Miller had received employment income from Leaks Construction. (Id. at 21.) Agent

7

Loke further testified that Miller used three PNC Bank cashier's checks, totaling $28,000, to purchase the 2410 Vista Street Property. (Id. at 22; Gov't Ex. 123.2.) These checks had been purchased by Natasha Audain, using cash, on July 31, 1997 (a $9,800 check), August 1, 1997 (a $9,100 check), and August 5, 1997 (a $9,100 check). (3/9/12 N.T. at 22; Gov't Ex. 123.2.) Agent Loke also traced nine of the money orders Miller used to purchase the property to cash, most of those money orders which were in the amount of $500. (3/9/12 N.T. at 23, Gov't Ex. 123.3.)

Natasha Audain testified about her purchase of the three PNC Bank checks that Miller used to buy the 2410 Vista Street Property. Audain testified that she met Miller in 1996 or 1997 and that they had a romantic relationship. (3/5/12 N.T. at 4, 6.) Around the end of July 1997, Miller asked her to obtain a cashier's check from the bank for him. (Id. at 10.) He met her outside the bank on July 31, 1997, and gave her $9,800, which she used to purchase a cashier's check made out to Century 21 with the remitter names of Natacha [sic] Audain and Mark Miller. (Id. at 11-13; Gov't Ex. 123.2.) Miller asked her to get another check on August 1, 1997 and again met her outside of the bank, where he gave her $9,100 in cash. (Id. at 14; Gov't Ex. 123.2.) She used the cash to purchase a cashier's check made out to Century 21 with the remitter name of Natacha [sic] Audain. (Id.; Gov't Ex. 123.2.) A few days later, on August 5, 1997, Miller asked Audain to obtain a third check and, once again, met her outside the bank where he gave her $9,100 in cash. (3/5/12 N.T. at 14-15; Gov't Ex. 123.2.) Audain used the cash to purchase a third cashier's check made out to Century 21 with the remitter name of Natacha [sic] Audain. (Gov't Ex. 123.2.)

Agent Loke testified that, on October 1, 2003, Miller obtained a new mortgage for the 2410 Vista Street property from Wachovia Bank in the amount of $73,080. (3/9/12 N.T. at 24; Gov't Exs. 106A.1, 106A.3.) Miller's mortgage application states that he had been employed by Credit

8

Consulting as an office manager for more than eight years at the time of the application. (Id. at 24, Gov't Ex. 106A.2.) Agent Loke testified that Miller had never been employed by Credit Consulting and that no credit consulting firm ever filed a W-2 for Miller. (Id. at 24-25.) Derrick Dandridge, owner of Credit Repair Consultants, testified at trial that he was a close friend of Miller's, but that Miller never worked for him. (3/1/12 N.T. at 173, 180-81.) Miller did file a tax return in 2003, however, the only employment that he listed on his 2003 tax return was with MJM Development & Demo Inc. (3/9/12 N.T. at 25; Gov't Ex. 145C.) Agent Loke further testified that Miller's mortgage application included a 2001 tax return showing total income in the amount of $63,972.00 and a 2002 tax return showing total income in the amount of $69,924. (Id. at 25-26; Gov't Exs. 106A.4, 106A.5.) Miller, however, did not file a tax return in 2001 and the tax return and W-2 he filed in 2002 showed only $9,000 in total income, all of which was paid by MJM Development & Demo Inc. (Id. at 26; Gov't Ex. 145B.)

On July 27, 2005, Miller obtained another mortgage on the 2410 Vista Street property, in the amount of $154,000. Agent Loke testified that Miller's mortgage application states that he had been employed by C&J Property and Realty Concepts for four years at the time he prepared the application. (Id. at 27; Gov't Ex. 102B.1.) The application includes W-2s and earning statements from C&J Property and Realty Concepts for the years 2003 and 2004 that show that Miller earned $51,228 in 2003 and $55,485 in 2004. (Id. at 28-29; Gov't Ex. 102B.3.) Miller, however, was never employed by C&J Property and Realty Concepts. (Id. at 27.)

Jacqueline Johnson, owner of C&J Realty and Property Concepts, a cleaning business, testified that Miller told her in 2005 that he was trying to obtain a mortgage and that he needed pay stubs and a W-2. (3/1/12 N.T. at 222-24, 226.) Miller asked her to create pay stubs and a W-2 for

9

him "on her company," which she did. (Id. at 227-29, 235-37; Gov't Ex. 102B.3.) Johnson also testified that Miller's statement on this mortgage application that he had worked for C&J Property and Realty Concepts was false. (Id. at 234.) IRS Agent Kelly testified that he examined a 2003 W-2 prepared for Miller by C&J Property & Realty Concepts and that this W-2 had not been filed with the IRS. (3/5/12 N.T. at 271.) Agent Loke further testified that the tax return that Miller filed in 2003 showed that he had $9,460 in total income, and the W-2 attached to that return shows that Miller was paid $9,460 in 2003 by MJM Development and Demo Inc. (3/9/12 N.T. at 25, 29; Gov't Ex. 145C.) The tax return and W-2 that Miller filed in 2004 showed $11,220 in total income, also paid by MJM Development & Demo Inc. (Id. at 29; Gov't Ex. 145D.)

Agent Loke testified that, on March 16, 2007, Miller transferred his interest in the 2410 Vista Street property to his girlfriend, Tracy Barco, for $220,000. (Id. 29-30; Gov't Ex. 118E.1.) In connection with the sale, Miller received a check in the amount of $22,412.34 from First Option Title Agency. (3/9/12 N.T. at 30, Gov't Ex. 113C.2.) Miller cashed this check at Commerce Bank (Miller's cashing of this check is the financial transaction charged in Count 21 of the Second Superseding Indictment). (Id. at 30-31; Gov't Ex. 113C.2.) As part of the same transaction, Miller purchased a cashier's check from Commerce Bank for the amount of $22,412.34, made out to First Option Title; this second check was submitted by Ms. Barco as her down payment for the purchase of 2410 Vista Street (Miller's purchase of this check is the financial transaction charged in Count 22 of the Second Superseding Indictment). (3/9/12 N.T. at 32-34; Gov't Ex. 113C.2.)

Viewing the evidence in the light most favorable to the Government, we conclude that a rational juror could have found the following. Miller used $34,000 in cash, which he converted to cashier's checks and money orders, to purchase the 2410 Vista Street property in 1997. The cash

that he used in 1997 was nearly three times his reported social security income for the twenty-two year period from 1986 and 2007 and he possessed that cash at a time in which he reported no income whatsoever to the IRS. Miller acted to conceal that he was the source of a significant portion of that cash by using his girlfriend to purchase the cashier's checks for him, using cash that he provided to her, while he waited outside the bank. Miller also obtained a mortgage for $46,300 in connection with his purchase of this property through the use of fraudulent information concerning his employment and income. Miller also used fraudulent employment information and documentation which concealed the true source of his income to obtain additional mortgages for the 2410 Vista Street property in 2003 and 2005. Miller then acted to conceal his continued financial interest in the 2410 Vista Street property in 2007 by transferring his interest in that property to his then girlfriend by taking cash out of the property in connection with the transfer and using that cash to purchase a cashier's check which he then used to pay his girlfriend's down payment on the property. We conclude that a rational trier of fact could have found beyond a reasonable doubt, based upon this evidence, that Miller entered into the transactions charged in Counts 21 and 22 with the intent to conceal or disguise the nature, location, source, ownership or control of the proceeds of drug trafficking.

### 2. The 4829 Mulberry Street property

Russell Cottrell testified that he sold the 4829 Mulberry Street property, which had been damaged by fire, to Miller in 2004 for a total of $13,000, comprised of $1,500 in cash and Miller's agreement to pay all of Cottrell's outstanding bills and liens on the property. (3/5/12 N.T. at 180-190; Gov't Ex. 111E.1.) Agent Loke testified that Miller paid a total of $14,084.50 for the property, including $1,084.50 in settlement charges, on September 24, 2004. (3/9/12 N.T. at 35-36; Gov't Ex.

11

111E.1.). As we described earlier, Miller reported only $11,220 in total income in 2004. (3/5/12 N.T. at 266; Gov't Ex. 145D.) Miller paid $1,090 at settlement, most of that in cash, in addition to the cash that he had already paid Cottrell and the liens that he had assumed. (3/9/12 N.T. at 36-37; Gov't Exs. 111E.1, 111E.2, and 111E.3.) Miller renovated the 4829 Mulberry Street property after he purchased it. Alphonso Mitchell, Jr., a carpenter, testified that he did work for Miller at 4829 Mulberry Street, for which Miller paid him $7,000-$8,000 in cash. (3/2/12 N.T. at 4-5, 19; Gov't Ex. 159O).

Agent Loke testified that Miller applied for a mortgage for the 4829 Mulberry Street property in 2006 in the amount of $74,400. (3/9/12 N.T. at 38-39.) Miller's mortgage application states that his employer was C&J Property, that Miller had worked for C&J Property for more than four years, and that Miller earned $4,623 permonth. (Id. at 38-39, Gov't Ex. 104D.1.) Miller's mortgage application includes a W-2 for 2005 showing that Miller earned $55,485 from C&J Property and Realty Concepts during 2005. (3/9/12 N.T. at 40; Gov't Ex. 104D.3.) Johnson testified that she did not prepare the 2005 W-2 for Miller. (3/1/12 N.T. at 240.) Agent Loke testified that this 2005 W-2 was not filed with the IRS. (3/9/12 N.T. at 40-41.) Miller's mortgage application for 4829 Mulberry Street also includes a Telephone Verification Form showing that Miller's employment with C&J Property and Realty Concepts had been verified over the phone by someone named Crystal Brown. (Gov't Ex. 104D.4.) Johnson testified that no one named Crystal Brown ever worked for C&J Property and Realty Concepts. (3/1/12 N.T. at 242-43.)

Agent Loke testified that, on February 28, 2006, Miller received a mortgage as a result of that application in the total amount of $74,400. (3/9/12 N.T. at 43; Gov't Ex. 112.1.) The proceeds of the mortgage, $73,007.83, were wired from Argent Mortgage Company to Atlantic Search and

Abstract Company at the Sovereign Bank in Wyomissing, Pennsylvania with a value date of March 3, 2006 at 12:00 a.m. (this wire transfer is the financial transaction that is the subject of Count 23). (3/9/12 N.T. at 43-44; Gov't Ex. 135.1.) Atlantic Search & Abstract Co., Inc. wrote four checks, totaling approximately $51,000, to Miller from the proceeds of the mortgage and Miller cashed all of those checks at a Pratt Services, a check cashing agency:[1] (1) a check for $37,290.44 dated March 2, 2006 (Miller's cashing of this check is the financial transaction that is the subject of Count 24 of the Second Superseding Indictment); (2) a check for $1,680.00 dated March 2, 2006 (Miller's cashing of this check is the financial transaction that is the subject of Count 25 of the Second Superseding Indictment); (3) a check for $600.00 dated March 2, 2006 (Miller's cashing of this check is the financial transaction that is the subject of Count 26 of the Second Superseding Indictment); and (4) a check for $12,815.50 dated March 2, 2006 (Miller's cashing of this check is the financial transaction that is the subject of Count 27 of the Second Superseding Indictment). (3/9/12 N.T. at 44-46; Gov't Exs. 112.1, 112.2, 112.3.)

Viewing the evidence in the light most favorable to the Government, we conclude that a rational juror could have found the following. Miller purchased the 4829 Mulberry Street property without a mortgage in 2004 for the total amount of $14,084.50, which was more than his reported income that year. He paid approximately $2,500 of that sum in cash, which represents more than 20% of his total reported annual income in 2004. Miller settled on the 4829 Mulberry Street property on September 24, 2004. (Gov't Ex. 111E.1.) At some point after September 20, 2004 and before February 28, 2006, Miller paid $7,000 - $8000 in cash for repairs to that property. Miller paid

---

[1]Glen Weinstein, the owner of Pratt Services Incorporated, testified that his corporation cashed checks and sold money orders in the Frankford Section of Philadelphia in the 1990s and 2000s and that Miller was one of his customers. (3/5/12 N.T. at 194-96.)

cash for the repairs at a time in which he had no reported legitimate income.[2] Miller subsequently used fraudulent employment information and documentation which concealed the true source of his income to obtain a mortgage in the amount of $74,400 on the 4829 Mulberry Street property on February 28, 2006. Miller then converted approximately $51,000, which he had received from the proceeds of the mortgage, into cash at a check cashing agency, even though he had accounts at Wells Fargo and Third Federal Bank. We conclude that a rational trier of fact could have found beyond a reasonable doubt, based upon this evidence, that Miller entered into the transactions charged in Counts 23-27 with the intent to conceal or disguise the nature, location, source, ownership or control of the proceeds of drug trafficking.

Miller's Rule 29 Motion is, therefore, denied as to his argument that the Government did not present sufficient evidence at trial to prove that he entered into the financial transactions listed in Counts 21-27 of the Second Superseding Indictment with the intent to conceal the nature and source of the proceeds he used in those transactions.

## III. CONCLUSION

For the foregoing reasons, the Rule 29 Motion is denied. An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova
_____
John R. Padova, J.

---

[2] As we mentioned earlier, Miller did not file tax returns in 2005 and 2006. (3/5/12 N.T. at 266; Gov't Ex. 159K.) In addition, Miller had no reported Social Security Income in 2005 and 2006. (Gov't Ex. 155B.)